[Cite as *State v. Carpenter*, 2023-Ohio-4062.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-6 |
| | : | |
| v. | : | Trial Court Case No. 21 CRB 01115 |
| | : | |
| DAVID J. CARPENTER | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 9, 2023

. . . . . . . . . . .

THOMAS R. SCHIFF, Attorney for Appellant

SAMUEL J. KIRK, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} David J. Carpenter was convicted after a bench trial in the Xenia Municipal Court of dereliction of duty, a second-degree misdemeanor. The trial court ordered him to pay restitution to the Bellbrook-Sugarcreek School District in the amount of $502 and court costs. Carpenter appeals, claiming that his conviction was based on insufficient evidence and was against the manifest weight of the evidence. For the following

reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} Carpenter became a member of the Board of Education for Bellbrook-Sugarcreek Local School District in 2016. Between January and May 2019, the other Board members included Virginia Slouffman, Kathy Kingston, Mary Frantz, and Elizabeth Betz; Betz was the Board's president, and Carpenter was the Board's vice president. Carpenter described himself as a "short-timer on the board and not particularly welcome" by Betz, Frantz, and Kingston. Douglas Cozad was the superintendent of the school district.

{¶ 3} A tax levy benefiting the Bellbrook-Sugarcreek Local School District was on the Greene County special election ballot on May 7, 2019. Citizens for Bellbrook-Sugarcreek Schools was a political action committee (PAC) active in the months leading up to the May 7, 2019 special election and supported the passage of the levy. During that time, Cozad helped organize the activities of the PAC and sent emails and PAC meeting agendas discussing PAC business to members and volunteers of the PAC, including school employees and officials.

{¶ 4} Carpenter received Cozad's communications, attended a couple of PAC meetings, made a monetary contribution to the PAC from his personal accounts, and volunteered with the PAC by counting door hangers for distribution. Cozad's emails were sent to Carpenter's Board email address. Carpenter replied to one email with information about how school funding works. State's Ex. 5.

{¶ 5} An ongoing area of concern was a group of citizens opposed to the passage

of the levy. On February 7, 2019, Slouffman texted Cozad and the other Board members, saying that some community members "are questioning the need for the levy, the already high taxes, and urging others not to vote for it. Confusion from one of the news agencies that identified the levee [sic] as a new tax rather than a replacement." State's Ex. 10. On March 20, 2019, Cozad issued a media release about the school district's fiscal responsibility.

{¶ 6} On April 19, 2019, Kingston texted the other Board members, saying that Cozad and Betz thought that the Board should write a letter to the community explaining why it decided to put the levy on the ballot. State's Ex. 15. Carpenter provided input on what could be included in the letter. State's Ex. 17.

{¶ 7} Ultimately, in late April or early May, the Board sent two postcards, both double-sided. One postcard, invoiced as the "Board postcard," said, "Continue the Excellence with the passage of Issue 4!" It included a photograph of the five Board members and provided a web address for levy information. The back of the postcard had a lengthy statement with information about the school district's performance and funding, signed by the five Board members. State's Ex. 20.

{¶ 8} The second postcard, invoiced as the "District postcard," wrote in large letters "Issue #4 Important!" along with five bullet-point statements regarding the school district's "A" rating and budget information, as well as the voting hours. On the back, the postcard said, "Issue #4 is critical to maintain our excellent schools, programs, and fund day-to-day operations!" It also provided seven supporting statements:

- Sustain Operating Budget
- Avoid Additional Cutbacks

- Fund Exceptional Curriculum
- Keep & Attract Quality Teachers
- Provide Enhanced Technology
- Maintain Academic Excellence
- Continue the Investment in our Kids

State's Ex. 20. (Similar language was used by the PAC in its promotional materials. *See* State's Ex. 9.) Both postcards indicated that they were paid for by Bellbrook-Sugarcreek Schools. The costs for the postcards were $3,206.26 (District postcard) and $2,008.11 (Board postcard), which were billed to Bellbrook-Sugarcreek Schools, care of the school district's treasurer. State's Ex. 21. The invoice was paid by the treasurer via a check dated May 14, 2019, per the authorization of the Board or the superintendent. *Id.*

{¶ 9} On November 4, 2021, Carpenter was charged by complaint with two offenses: (1) illegal transaction of public funds, in violation of R.C. 9.03(D) and R.C. 3599.40, a first-degree misdemeanor, and (2) dereliction of duty, in violation of R.C. 9.03(C) and R.C. 2921.44(E), a second-degree misdemeanor. The first charge alleged that Carpenter had knowingly used public funds to benefit a PAC by way of "payment for a mailer containing post cards promoting an operating levy." The second charge specified that Carpenter had "use[d] public funds to publish, distribute, or otherwise communicate information that supports the passage of a levy." Cozad and other Board members were also charged under separate case numbers.

{¶ 10} Slouffman and Carpenter were jointly tried at a bench trial held in December 2022. At trial, the State presented stipulated facts (State's Ex. 29) and 28 incorporated exhibits. Carpenter and Slouffman testified on their own behalf. During his testimony,

Carpenter acknowledged that public money could not be used to support the PAC, but he denied knowledge that public funds were used for that purpose. He also asserted that the content of the postcards was factual, not advocacy, and that he did not see the postcards before they were sent. At the conclusion of the trial, the court granted Carpenter's Crim.R. 29 motion on the illegal transaction of public funds charge but found Carpenter guilty of dereliction of duty.

{¶ 11} The court proceeded immediately to sentencing. Defense counsel asked that the trial court only require Carpenter to pay for a quarter of the cost of the Board postcard. He further asked that, upon payment, "any other sentence or any other imposition of sentence be terminated," which would allow Carpenter to ask for the sealing of the record in a year. Counsel indicated that Carpenter would make payment that day. The State responded that it was fine with defense counsel's suggestion. After hearing from Carpenter, the court ordered him to pay restitution of $502; no jail term or fine was imposed. The trial court's judgment entry imposed the stated restitution and court costs.

{¶ 12} Carpenter appeals from his conviction. He claims that his conviction was based on insufficient evidence and against the manifest weight of the evidence.

## II. Mootness

{¶ 13} Before we address the merits of Carpenter's arguments, we must consider whether his appeal is moot.

{¶ 14} "The role of courts is to decide adversarial legal cases and to issue judgments that can be carried into effect." *Cyran v. Cyran*, 152 Ohio St.3d 484, 2018-Ohio-24, 97 N.E.3d 487, ¶ 9, citing *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d

371 (1970); *State v. Smith*, 2d Dist. Montgomery No. 27981, 2019-Ohio-3592, ¶ 8. "Issues are moot when they lack practical significance and, instead, present academic or hypothetical questions." *Dibert v. Carpenter*, 2018-Ohio-1054, 98 N.E.3d 350, ¶ 30 (2d Dist.), citing *State ex rel. Ford v. Ruehlman*, 149 Ohio St.3d 34, 2016-Ohio-3529, 73 N.E.3d 396, ¶ 55. Appellate courts lack jurisdiction to consider the merits of a moot appeal. *See State v. Berndt*, 29 Ohio St.3d 3, 4, 504 N.E.2d 712 (1987); *Smith* at ¶ 9.

{¶ 15} Appeals of misdemeanor convictions are considered moot if the defendant has voluntarily satisfied his or her sentence, unless the defendant has offered evidence from which an inference can be drawn that he or she will suffer some collateral legal disability or loss of civil rights stemming from that conviction. *State v. Wilson*, 41 Ohio St.2d 236, 325 N.E.2d 236, syllabus; *Urbana v. Boystel*, 2d Dist. Champaign No. 2021-CA-5, 2021-Ohio-2529, ¶ 9. A defendant can show that he or she did not serve a sentence voluntarily if the defendant sought a stay of the sentence to allow for the appeal. *Smith* at ¶ 10, citing *Cleveland Hts. v. Lewis*, 129 Ohio St.3d 389, 2011-Ohio-2673, 953 N.E.2d 278, ¶ 23. A sentence is also considered involuntarily served when it is entirely served prior to conviction. *Id.*, citing *State v. Benson*, 29 Ohio App.3d 109, 110, 504 N.E.2d 77 (10th Dist.1986).

{¶ 16} "A collateral disability is an adverse legal consequence of a conviction or judgment that survives despite the court's sentence having been satisfied or served." *In re S.J.K.*, 114 Ohio St.3d 23, 2007-Ohio-2621, 867 N.E.2d 408, ¶ 10. "[A] purely hypothetical statement about what might occur in the future is not sufficient to give viability to an otherwise moot appeal." *State v. Moore*, 2d Dist. Montgomery No. 20772, 2005-

Ohio-4518, ¶ 14, quoting *State v. Johnson*, 43 Ohio App.3d 1, 3, 538 N.E.2d 1082 (1st Dist.1988); *State v. Washington,* 2d Dist. Montgomery No. 27690, 2018-Ohio-1231, ¶ 10, quoting *Moore*.

**{¶ 17}** "A court may consider extrinsic evidence from outside the record to determine mootness." *Pruitt v. Pruitt*, 2d Dist. Montgomery No. 29331, 2022-Ohio-2058, ¶ 14, citing, *e.g., State ex rel. Cincinnati Enquirer v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 8.

**{¶ 18}** In this case, defense counsel asked the trial court to sentence Carpenter to restitution of $502 with any other imposed sanction terminating upon payment. Counsel told the court that such a sentence would allow Carpenter to ask for the sealing of the record a year from then. Defense counsel indicated that Carpenter would pay the restitution that day. The trial court imposed $502 in restitution, as requested, plus court costs. According to the Xenia Municipal Court's online docket, of which we take judicial notice, Carpenter owed a total of $560 in court costs as of December 15, 2022; all court costs have been paid. The online docket does not show, however, that restitution was owed or whether it was paid.

**{¶ 19}** Given defense counsel's statements to the trial court at sentencing and the fact that the clerk's online docket showed no balance due, we issued an order requiring Carpenter to show cause why the appeal should not be dismissed as moot. Carpenter responded to the order, noting that he was sentenced to $502 in restitution, $0 in fines, and no jail time. He further stated: "Upon the advice of counsel, and in order to avoid any issue of mootness in the Court of Appeals, Appellant has paid neither the fines nor

costs per the Court's sentence." Carpenter did not assert that his conviction resulted in a collateral disability.

{¶ 20} We find Carpenter's response to be somewhat confusing. Court costs are distinguishable from financial sanctions, such as fines and restitution, which are in turn distinguishable from each other. Court costs are imposed pursuant to R.C. 2947.23. In misdemeanor cases, restitution and fines are governed by R.C. 2929.28(A)(1) and (2), respectively. Carpenter acknowledged that restitution was imposed, but he stated that he had not paid the imposed "fines" (which were not actually imposed) and "costs." It is not clear what he is saying he has not paid; Carpenter did not address the payment information contained on the online docket.

{¶ 21} We infer that Carpenter has not paid the ordered restitution, which was part of his sentence. The online docket makes no mention of the ordered restitution, and Carpenter appears to deny making any required payment. Even assuming that court costs also (or instead) are outstanding, we have held that "[u]npaid court costs alone are sufficient to prevent a judgment from being moot, even if an appellant has completed his jail sentence." *State v. Ruley*, 2d Dist. Miami No. 2017-CA-10, 2018-Ohio-3201, ¶ 10; *see also, e.g., State v. Holley*, 2d Dist. Greene No. 2019-CA-44, 2020-Ohio-5104, ¶ 16. With the information before us, we must conclude that this appeal is not moot.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 22} We turn to Carpenter's arguments that his conviction was based on insufficient evidence and was against the manifest weight of the evidence.

{¶ 23} "A sufficiency of the evidence argument disputes whether the State has

presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 24} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 25} In this case, Carpenter was convicted of dereliction of duty, in violation of

R.C. 9.03(C) and R.C. 2921.44(E). Under the dereliction of duty statute, public servants are prohibited from recklessly doing any act expressly forbidden by law with respect to the public servant's office or, alternatively, from recklessly failing to perform a duty expressly imposed by law with respect to that office. R.C. 2921.44(E).

{¶ 26} "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 27} In general, governing bodies of political subdivisions, such as the Board of Education of Bellbrook-Sugarcreek Local School District, may use public funds to "publish and distribute newsletters, or to use any other means, to communicate information about the plans, policies, and operations of the political subdivision to members of the public within the political subdivision and to other persons who may be affected by the political subdivision." R.C. 9.03(B). There are, however, several exceptions to the general rule. Of relevance here, such governing bodies may not use public funds to "[p]ublish, distribute, or otherwise communicate information that * * * [s]upports or opposes * * * the passage of a levy or bond issue." R.C. 9.03(C)(1)(e).

{¶ 28} Carpenter offers several reasons for why the evidence did not support his conviction for dereliction of duty. First, he maintains that the content of the postcards did not amount to "advocacy." He focuses on the phrase "Continue the Excellence" on the

Board postcard and asserts that this "tagline" was merely a statement of fact. Next, he argues that he did not design the content of the postcards and did not see them until after they were sent. In conjunction with this argument, he asserts that he did not act recklessly.

{¶ 29} Upon review of State's Exhibit 20, the trial court reasonably concluded that the Board postcard, which was paid for by Bellbrook-Sugarcreek Board of Education, supported the passage of a levy, Issue #4. While much of the letter on the back of the Board postcard could be characterized as information about "the plans, policies, and operations" of the school district, both the front and back of the Board postcard contained the phrase, "Continue the Excellence with the passage of Issue 4!" This phrase unambiguously urged recipients of the mailing to maintain the high quality of the district's schools ("continue the excellence") by voting in favor of the levy ("with the passage of Issue 4"). Carpenter's argument that the Board postcard was purely factual, not advocacy, is belied by the postcard itself. The trial court's conclusion that the Board postcard supported the passage of the levy was neither based on insufficient evidence nor against the manifest weight of the evidence.

{¶ 30} Carpenter's argument that he did not act recklessly relies substantially on his assertion that he was not engaged in the creation of the Board postcard and did not see it in any form until he received it through the mail. Upon review of the stipulated exhibits and the testimony at trial, the trial court reasonably found that Carpenter's conduct rose to the level of recklessness.

{¶ 31} On April 19, 2019, Kingston texted the other Board members, writing that

Cozad and Betz thought that the Board should write a letter to the community about "the levy and why we decided to put it on the ballot." State's Ex. 15. Kingston indicated that she would be working on a first draft and asked the other Board members for "some bullet points of your thoughts." *Id.* In Cozad's weekly update for April 19, 2019, which was emailed to the Board on April 20, Cozad similarly wrote: "Kathy is working on a letter from the Board that will go out to the community. Please send her your thoughts." State's Ex. 16.

{¶ 32} On April 22, Carpenter provided a lengthy reply to Kingston. State's Ex. 17. He included a copy of a response that he had given to a constituent on Facebook, which stated, in part:

> * * * [A]n investment in quality schools always pays off. Communities with good schools are safer with lower crime rates and better home values. The local economies are stronger. Persons who may need to rely on their home value for necessary life changes (like moving to assisted or custodial care environments) have the financial resource to do so. Of course, for those with children or grandchildren in the district, you are helping them get the best start possible. Hope this helps. Happy to have this discussion with you.

Carpenter also provided Kingston a bullet-point list with several reasons for putting the levy on the ballot or avoiding a loss of funding. Six bullet points were from the "student perspective," addressing the top-level education they receive, the funding needs for extracurricular programs, the benefits of sports and marching band, the opportunity for

programs on emerging technologies and industries, adequate teaching staff, and class sizes. Two bullet points were from a "parent perspective" and related to the effects of reduced funding on school transportation and parents' choice of residence. Three were from a "citizen perspective," noting the effects of loss of funding on property values, numbers of teachers, and perception of the community.

{¶ 33} In email responses sent later that day, other Board members were complimentary of Carpenter's comments. Kingston also asked in an email what the postcard's dimensions would be. State's Ex. 17. Cozad responded, "6 x 9… so it can't be a [sic] too lengthy." *Id.*

{¶ 34} Carpenter understood that the Board would be mailing a postcard to the community regarding the reasons the levy was put on the ballot. Considering the vocal opposition that the levy was receiving, the trial court reasonably concluded that the purpose behind the mailing was to support the passage of the levy. Carpenter provided suggestions for the postcard's content which, while perhaps factual, went beyond simply information "about the plans, policies, and operations" of the school district. *See also* R.C. 3315.07(B) (describing bulletins and other materials that may be provided by a board of education with school funds). He acknowledged that his Facebook response to a citizen was "somewhat of a blending" of advocacy and statements of fact, and he testified that he forwarded that response to the Board for consideration in drafting the letter from the Board. His bulleted list provided reasons why different community members would want the levy on the ballot or to avoid loss of funding. Although the postcards did not incorporate many of Carpenter's suggestions and he did not see the postcards

themselves until after they were sent, we cannot conclude that the trial court lost its way in concluding that Carpenter had acted recklessly with respect to the content of the postcards and the use of district funds to pay for them.

**{¶ 35}** Carpenter's assignments of error are overruled.

### III. Conclusion

**{¶ 36}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.